UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 14-44095-PJS |
| | ) | |
| ASSOCIATED COMMUNITY | ) | Chapter 11 |
| SERVICES, INC., | ) | |
| Debtor. | ) | Hon. Phillip J. Shefferly |
| —————————————— | ) | |
| | ) | Adv. Proc. No. 15-05029-PJS |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ASSOCIATED COMMUNITY | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| —————————————— | ) | |

## FIRST AMENDED ADVERSARY COMPLAINT FOR
## REVOCATION OF ORDER OF CONFIRMATON AND DISCHARGE

Plaintiff United States of America submits this first amended complaint in accordance

with Fed. R. Civ. P. 15(a)(1)(A) (made applicable to adversary proceedings by Fed. R. Bankr. P.

7015).

Plaintiff United States of America, pursuant to the provisions of 26 U.S.C. § 7401, with

the authorization of the Secretary of the Treasury and at the direction of the Attorney General of

the United States, brings this first amended adversary complaint against the Defendant,

Associated Community Services, Inc., to revoke the order of confirmation and to revoke the

discharge of the Defendant pursuant to 11 U.S.C. § 1144 which, Plaintiff contends, was procured

by fraud upon the Court, and in support thereof makes the following allegations:

1

## Parties, Jurisdiction, and Venue

1.      The Plaintiff United States of America is a creditor of the Debtor.

2.      On March 13, 2014, Associated Community Services, Inc., as Debtor and Debtor In Possession ("Debtor"), filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

3.      Debtor continues to act as the reorganized debtor.

4.      No requests have been made for the appointment of a trustee or examiner, and no official committee has been appointed by the United States Trustee.

5.      Debtor is within the jurisdiction of this Court.

6.      On October 10, 2014, Debtor filed a Combined Plan of Reorganization and Disclosure Statement.  *See* ECF 133 (referred to as the "Disclosure Statement").

7.      The plan was confirmed on April 24, 2015, and the Debtor received a discharge of debts under 11 U.S.C. § 1141 by order of this Court.

8.      This action arises under 11 U.S.C. § 1144.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334.

9.      This action is timely insofar as it was filed within 180 days from the date of the order of confirmation.

10.      This adversary proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (J), (L), and (O).

11.      To the extent it applies and pursuant to the requirements of L.R. 9021-1, the United States consents to entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**Factual Allegations**

**Pending Investigation of Debtor and Debtor's Principal Clients**

12.     The Debtor operates a calling center and has solicited donations on behalf of charitable organizations pursuant to telemarketing and direct mail marketing contracts.

13.     On or about December 22, 2010, Debtor received a Civil Investigative Demand from the State of New Mexico Attorney General's Office, including both interrogatories and a request for production of documents, requesting information from Debtor concerning its relationship with four of Debtor's clients: Cancer Support Services, Inc. ("CSS"), Cancer Fund of America, Inc. ("CFA"), Children's Cancer Fund of America, Inc. ("CCFA"), and The Breast Cancer Society, Inc. ("TBCS") (collectively the "Alleged Sham Charities").

14.     The Debtor solicited donations on behalf of the Alleged Sham Charities and, upon information and belief, was the principal source of revenue for each of the entities.

15.     Debtor was represented by the law firm of Copilevitz & Canter, LLC ("C&C") in its response to the Civil Investigative Demand issued to the Debtor by the State of New Mexico Attorney General's Office.

16.     By letter dated February 14, 2011, C&C provided written responses to the interrogatories and requests for production on behalf of Debtor, and by letter dated February 25, 2011, produced the responsive documents by CD-ROM.

17.     Upon information and belief, during late 2010, C&C communicated with the principals of CSS, CFA, CCFA, and TBCS, and notified them that a Civil Investigation Demand had been issued to the Debtor.

18.     The multi-state investigation centered on whether donations were being used for charitable purposes, and whether donors were being misled.

19.     Upon information and belief, the Debtor and each of the four principal clients, CSS, CFA, CCFA, and TBCS, were represented also by the law firm of C&C in the multi-state investigation described above.

20.     Upon information and belief, in 2011 the law firm of C&C shared information about the investigation of the Debtor with each of Debtor's four principal clients, CSS, CFA, CCFA, and TBCS.

### Affirmative Attempt to Conceal Debtor's Control Over CSS

21.     In November 2011, CSS removed Dick Cole's authorization to sign checks on behalf of CSS because of the pending multi-state investigation.

22.     In November 2011, CSS sought to obtain a formal lease for the property it was using in Michigan, because of the pending multi-state investigation, so that the Debtor and CSS could appear to be separate entities.

### Attempt To Conceal Communications

23.     Upon information and belief, as reflected in an "Outlook contacts" list obtained from TBCS, Debtor's principals and officers, Bill Burland and Richard Cole (also referred to as Dick Cole), used personal email accounts instead of corporate email accounts, to conduct business in private, especially for CSS, as early as 2003: Bill Burland designating the use of the personal email address, "willie501@aol.com" and Richard Cole designating the use of his wife's personal email address, "begga911yahoo.com."

### Debtor's Control and Funding of CSS

24.     CSS corporate records dated December 5, 2008, reflect that CSS was formed in 2002 after James Reynolds, Sr., approached Dick Cole with an idea to start an entity that would raise money solely for CFA, the main office of which would be located at the same location as that of

the Debtor in Dearborn, MI, and that the start-up cost to expand Debtor's Dearborn office for CSS was $1 million.

25.     On August 17, 2005, CSS faxed to the State of Michigan Unemployment Insurance Agency a power of attorney form authorizing Packer & Associates to represent it.  Packer & Associates also represented Debtor before the State of Michigan in unemployment matters.  The power of attorney was signed by Dick Cole, upon information and belief, as an officer of CSS.

26.     By letter dated January 1, 2008, Loretta Cynowa, General Counsel for Debtor, wrote to the State of Michigan Department of Labor and Economic Growth, in which she represented on behalf of both Debtor and CSS, that both corporations would no longer be represented by Packer & Associates and that in the future all correspondence for both entities should be sent to her at Debtor's principal place of business.

27.     By letter dated February 11, 2008, Loretta Cynowa again wrote to the State of Michigan Department of Labor and Economic Growth, in which she again represented on behalf of both Debtor and CSS, that both entities would no longer be represented by Packer & Associates and that in the future all correspondence should be sent to her.

28.     On or about February 13, 2008, the State of Michigan Unemployment Insurance Agency (MUIA) received a Form UIA 1025, Employer Request for Address/Name Change, on behalf of CSS signed and dated February 11, 2008, by Loretta Cynowa as the preparer, listing Loretta Cynowa as CSS' "corporate counsel," and listing CSS' address as  29777 Telegraph Rd. Ste 3000, Southfield, MI, identified as both the "physical location of the business" as well as its "mailing address."  Loretta Cynowa also listed her phone number of "(238) 352-2600" and the email address lynowa@cpsvcs.com.  This address was the physical address of the Debtor in

Southfield at the time, and the phone number and email address were Cynowa's contact information as corporate counsel for the Debtor at the time.

29.     By letter dated January 16, 2009, Loretta Cynowa represented to Administrative Law Judge Poirier of the State of Michigan Administrative Hearing System that she was appearing in unemployment hearings on behalf of both Debtor and CSS, in challenges to claims of unemployment compensation from discharged employees of both entities.

30.     On or about July 1, 2009, Loretta Cynowa wrote for the third time to the State of Michigan Department of Labor and Economic Growth, and enclosing her earlier letters sent in January and February, 2008, in which she again represented on behalf of both Debtor and CSS, that both entities would no longer be represented by Packer & Associates and that in the future all correspondence should be sent to her.

31.     On or about December 21, 2009, the State of Michigan Unemployment Insurance Agency, received a signed Form UIA 1025, Employer Request for Address/Name Change, on behalf of Debtor signed and dated December 19, 2009 by Loretta Cynowa on behalf of Debtor as the preparer and listing herself as "attorney."  On this form, Loretta Cynowa listed Debtor's address, 29777 Telegraph Rd. Ste 3000, as both the "physical location of the business" and its "mailing address." Loretta Cynowa also identified this address as the "Corporate Office," as well as the address for the "Accountant/Employer Rep" and the "Owner;" she also listed the phone number of "(238) 352-2600."

32.     On or about August 1, 2013, the State of Michigan Unemployment Insurance Agency (MUIA), received a signed Form UIA 1025, Employer Request for Address/Name Change, on behalf of CSS, signed and dated August 1, 2013, by Janice Looney ("Looney") on behalf of CSS as the preparer and listing herself as "Human Resource/Payroll manager."   On this form, Loony

changed CSS' address and contact information from being co-located with the Debtor, to

1 Parklane Blvd 1600 E., Dearborn Michigan as both the "physical location of the business" and

its "mailing address," which she identified as the "Corporate Office." Looney listed the phone

number "313 565-5901" as the "Employer's Phone Number" and the email address

JLoney@cssmi.org.  This form was faxed from a fax number that was used by the Debtor at its

Southfield location.

33.    State of Michigan records reflect that Janice Loony filed an application for

unemployment benefits in June of 2013, in which she represented that she previously been had

been employed by the Debtor, not CSS.

### Debtor's Control Over the Payroll of CSS

34.    Upon information and belief, from 2002 through June of 2005, Debtor controlled the

funding and the payment of the payroll expenses of Debtor and CSS through a payroll service

provider named National Staff Management.

35.    Upon information and belief, from June of 2005 through May of 2010, Debtor

controlled the funding and the payment of all payroll expenses on behalf of both Debtor and CSS

through a payroll service provider named Co-HR, LLC.

36.    Rock Drysdale of Co-HR, LLC, testified that he was personally involved in the

preparation of the payroll for both ACS and CSS from June 2005 to May of 2010, and that

Debtor controlled the payroll for both Debtor and CSS, including the preparation of the proposed

payroll and the funding of the payroll.

37.    Debtor's payroll records confirm that Debtor's payroll department controlled the

preparation of the payroll for both Debtor and CSS.

38.     Debtor's e-mail records reflect that Doreen Johnson, an employee of the Debtor in Debtor's payroll department, regularly corresponded using the title "Payroll Dept ACS/CPS/CSS."

39.     Upon information and belief, "CPS" is the abbreviation used by the Debtor for the entity "Central Processing Services, LLC," owned and controlled by Debtor's principals, Dick Cole and William Burland, which collects and processes the donations sent in by donors.

### Commingling of Debtor's and CSS' Funds

40.     In 2008, and 2009, Dick Cole, an officer of the Debtor, made multiple transfers of funds from CSS to Debtor as purported "loans" from CSS to Debtor, including, but not limited to CSS check Nos. 6164, 6168 6236, and 6237, drawn on a checking account held in name of CSS at Peoples Bank in Southfield, Michigan, signed by Dick Cole on behalf of CSS and made payable to the Debtor.

### Debtor's Management of CSS

41.     Upon information and belief, in 2011 Debtor managed the day to day business operation of CSS through its offices and its managers, including, but not limited to Richard Sikoski, an employee of the Debtor who was selected by Dick Cole to manage the day to day activities of CSS.  From 2008 through 2011, Sikoski was Debtor's on-site manager for CSS under the title "Chief Executive Manager."

42.     Notwithstanding the steps taken by the Debtor and the Alleged Sham Charities in 2011, as detailed above, to attempt to make CSS appear to be an independent corporation, it was not in fact independent, and remained under the dominion and control of the Debtor.

43.     Upon information and belief, the Debtor also knew of the pending multi-state investigation described above through its control of CSS.

**Joint Federal and Multi-State investigation**

44.     On or about November 2012, the Federal Trade Commission (FTC) joined in the multi-state investigation.

45.     The deposition of Lance Connaster, as a representative of CFA, was taken by the FTC on April 8, 2013, which was defended by Karen Donnelly of C&C.

46.     The deposition of Shirley Williams, as a representative of CFA and CSS, was taken by the FTC on April 8, 2013, which was defended by Karen Donnelly of C&C.

47.     The deposition of Brenda Williams, as a representative of CFA, was taken by the FTC on April 9, 2013, which was defended by Karen Donnelly of C&C.

48.     The deposition of Brian Morse, as a representative of CFA, was taken by the FTC on April 10, 2013, which was defended by Karen Donnelly of C&C.

49.     The deposition of Carol Cruze, as a representative of CFA, was taken by the FTC on April 11, 2013, which was defended by Karen Donnelly of C&C.

50.     The deposition of James Reynolds, Sr., as a representative of CFA, was taken by the FTC on April 12, 2013, which was defended by Karen Donnelly of C&C.

51.     The deposition of James Reynolds, Sr., as a representative of CFA and CSS, was taken by the FTC on April 12, 2013, which was defended by Karen Donnelly of C&C.

52.     By memo dated August 21, 2013, Errol Copilevitz and Karen Donnelly, both of C&C, wrote to James Reynolds, Sr., with a copy to Greg Lam of C&C, concerning James Reynolds, Sr.'s testimony, and proposed, *inter alia*, the following correction as to James Reynolds Sr.'s testimony concerning the fees charged by Debtor for soliciting charitable donations:

> On p. 321 of your transcript, you were asked about a percentage. In the transcript it said you responded, "Five percent of gross revenues collected, paid to ACS. . . ." After reviewing Revised Interrogatory Exhibit 36, on which Ms. Thorleifson bases her

> percentage question, this appears to be a typographical error in the
> transcript.  According to TBCS's Revised Exhibit 36, a copy of
> which is enclosed for reference, the percentage going to ACS is
> 55% and the percentage going to CPS is 30%, for a total of 85%
> going to ACS/CPS combined.  Therefore, the transcript should be
> corrected to read "Fifty-five percent of gross revenues collected,
> paid to ACS. . . ."

*See* TBCS-00100068-1 to TBCS-00100068-8, at p. 2.

53.     By memo dated August 21, 2013, Errol Copilevitz and Karen Donnelly, both of C&C,

wrote to James Reynolds, Sr., with a copy to Greg Lam of C&C, concerning James Reynolds,

Sr.'s testimony, in which they further wrote, *inter alia*:

> Based on the questions asked during the depositions conduced in
> Arizona, it appears likely that the FTC and the states will expand
> their inquiry to investigate fundraisers and vendors with which
> your organization contracts.  In addition to the material issues,
> those involved in the investigation have expended too much to just
> walk away.  Thus, there remains a strong possibility that the FTC
> and the many states will eventually file federal and state claims
> against the organization.

*See* TBCS-00100068-1 to TBCS-00100068-8, at p. 2.

54.     On or about November 6, 2013, Debtor's compliance officer, Jody Wahl, sent an email

on behalf of the Debtor to Karen Donnelly of C&C, concerning the pending joint federal and

multi-state investigation in which she wrote, inter alia:

> I note that the request came from Tracy Thorliefson [of the FTC].
> If James [Reynolds] is comfortable with you responding to me, I
> am wondering if you have a sense as to where this matter is
> going."  The FTC only has jurisdiction if they can establish that a
> charity is a "sham" charity, as I understand it.  Is there another
> theory at work? Or do you have any hint that she is investigating
> our clients when the ultimate target will be ACS?

*See* TBCS-00002634-1 to TBCS-00002634-8.

55.     In In response to this November 6, 2013, email from Jody Wahl, on behalf of the Debtor, Karen Donnelly of C&C sent an email to James Reynolds on November 7, 2013, in which she wrote:

> James, here is my proposed response.  Please let me know, first, whether you authorize me to discuss your case with her to the extent we are able to answer her questions, and second, provided you authorize us to respond, whether you approve my proposed response.
>
> Thanks, Jody. With respect to the FTC matter, you are correct – the FTC does not have jurisdiction over nonprofits. In order to have jurisdiction, they would have to claim the charity is a "sham" charity. With that said, we have no indication as to who or what entities would be named in a suit should the FTC determine to file. Perhaps remaining guardedly optimistic is the best bet until we know more…
>
> Thank you,
>
> Karen
>
> Karen Donnelly
> Copilevitz & Canter, LLC
> 310 W. 20th St., Suite. 300
> Kansas City, MO 64108
> 816-472-9000 ext. 249
> 816-472-5000 fax

*See* TBCS-00002634-1 to TBCS-00002634-8.

56.     Upon information and belief, in accord with her memorandum of August 21, 2013, Karen Donnelly informed Jody Wahl, Debtor's compliance officer, that there remained a strong possibility that the FTC and the many states would file federal and state claims against the Alleged Sham Charities, and that the FTC would investigate their fundraisers, namely the Debtor.

57.     In reply to this November 7, 2013, email from Karen Donnelly of C&C, James Reynolds authorized Karen Donnelly of C&C to discuss the pending joint federal and multi-state

investigation with Jody Wahl as a representative of the Debtor by responding, *inter alia*, "[yes], you are authorized to discuss answers to the questions Jody posed." *Id.*

58.     On or about November 13, 2013, Jody Wahl, on behalf of the Debtor, again emailed Ms. Donnelly and Greg Lam at C&C, and evidenced knowledge of the pending joint federal and multi-state investigation, by asking for C&C's legal advice on a response requested by the FTC lead counsel, Ms. Thorliefson, noting that Debtor's request to C&C was "…of especially high concern because the script will be furnished to the FTC." *See* TBCS-00002034-1 to TBCS-00002034-2; TBCS-00002035-1 to TBCS-00002035-4.

59.     The Debtor's Schedules lists three of the Alleged Sham Charities (CFA, TBCS and CCFA) that are named as defendants in a pending federal district court action described below, as holders of executory contracts.  ECF No. 33, Schedule G, p.24-27.  Certain of these executory contracts with the Alleged Sham Charities were assumed in papers filed in this Court by the Debtor.  ECF No. 264, p.4.

60.     Based upon the Debtor's records, it appears that the collections made pursuant to these executory contracts comprised approximately forty percent of the Debtor's income in the four years prior to the petition date.

61.     Debtor's application to Employ the law firm of Copilevitz & Canter, LLC, as Special Charity Law Counsel, further represented that Copilevitz had "continuously represented the Debtor since 1995...."  *See Application to Employ the law firm of Copilevitz & Canter, LLC, as Special Charity Law Counsel, at paragraph 13, ECF No. 59.*

62.     The Application to Employ the law firm of Copilevitz & Canter, LLC, as Special Charity Law Counsel, described the referenced "Administrative Matters" included a pending appeal in State of Iowa v. Associated Community Services, Inc., Case No. 13-0878 (Iowa Supreme court)

which involved a petition by ACS to quash a subpoena duces tecum issued by the Iowa Attorney General. *See Application to Employ the law firm of Copilevitz & Canter, LLC, as Special Charity Law Counsel, at paragraph 9, Docket No. 59.*

63. On May 7, 2014, the Court entered the Order Granting Debtor's Application to Employ the law firm of Copilevitz & Canter, LLC, as Special Charity Law Counsel. *See Order Granting Debtor's Application to Employ the law firm of Copilevitz & Canter, LLC, Docket No. 62.*

64. On August 4, 2014, the FTC sent Karen Donnelly of C&C, a letter "RE: Cancer Support Services, Inc., Children's Cancer Fund of America, Inc., the Breast Cancer Society, Inc., James Reynolds, Sr., Kyle Effler, Rose Perkins, James Reynolds II…", to which it attached a draft of its proposed complaint against the same "Alleged Sham Charities" (hereinafter "Draft FTC Complaint").

65. On October 10, 2014, Debtor filed a *Combined Plan of Reorganization and Disclosure Statement. See ECF 133* (referred to as the "Disclosure Statement").

66. The Disclosure Statement, dated October 10, 2014, disclosed a civil action in Los Angeles Superior Court concerning recording of telephone conversations and an action involving the State of Iowa, but failed to disclose the pending joint federal and multi-state investigation or the Draft FTC Complaint which had been sent to Debtor's counsel on August 4, 2014, notwithstanding the fact that the Debtor's compliance officer, Jody Wahl, clearly knew of the pending federal and multi-state investigation and Karen Donnelly of C&C, acting as Debtor's special bankruptcy counsel, had been authorized by James Reynolds on November 7, 2013, to discuss the status of the pending joint federal and multi-state investigation with Debtor's compliance officer, Jody Wahl. *See ECF No. 133, p. 53 of 67.*

67.    Debtor's *Combined Plan of Reorganization and Disclosure Statement* failed to disclose the pending joint federal and multi-state investigation or the Draft FTC Complaint, notwithstanding the fact that the Debtor's compliance officer Jody Wahl clearly knew of the pending federal and multi-state investigation.

68.    The Debtor's *Combined Plan of Reorganization and Disclosure Statement* was filed on October 10, 2014.  *See ECF No. 133* (the "Plan").  As of this date, the Debtor was aware of the joint federal and multi-state investigation when it filed the Disclosure Statement, but it did not disclose that the Debtor's principal clients – CFA, CCFA, and TBCS – were being targeted for shutdown.  In specific support of its Plan, Debtor attached as Exhibit E, revenue projections from 2015 – 2019, which showed yearly revenue growing by twelve percent over the life of the plan. *See ECF No. 133-1, p. 61 of 66.*

69.    On November 6, 2014, C&C filed a First Interim Fee Application as Special Charity Law Counsel to Debtor for Services Rendered from March 13, 2013 to September 30, 2014, in the amount of $38,145.50, which listed, *inter alia*, 24.6 hours for Karen Donnelly.  *Docket No. 165.*

70.    The First Interim Fee Application of C&C, dated November 6, 2014, C&C describes the fees charged as to "[a]ssist the Debtor in connection with ongoing registration, compliance, and regulatory notices and related litigation."

71.    The First Interim Fee Application of C&C, LLC, dated November 6, 2014, contains no disclosure of the ongoing joint federal and multi-state investigation, or Debtor counsel's receipt of the Draft FTC Complaint on August 4, 2014 in its capacity as counsel for CSS, a party-in-interest and Debtor's nominee and/or alter-ego, other than a time charge on August 19, 2014, for which it obliquely billed the Debtor for time related to a "[l]etter to Suzette Davis, Lindsay Byrne, Hitesh Desai via e-mail re: FTC request for comments."  *See ECF No. 165, p. 22 of 35.*

72. On March 26, 2015, the Debtor filed a *Modification to Debtor's Combined Plan of Reorganization and Disclosure Statement. See ECF No. 244* (referred to as the "Modified Disclosure Statement").

73. The Modified Disclosure Statement dated March 26, 2015, contained no disclosure of the ongoing joint federal and multi-state investigation or the Draft FTC Complaint.

74. On April 24, 2015, the Court held a confirmation hearing regarding the Debtor's plan. Neither the joint federal and multi-state investigation, nor the Draft FTC Complaint were disclosed to the Court, and because it appeared all classes of creditors had stipulated to an entry of an order of confirmation, the Court did not take any testimony. A confirmation order was entered on the same afternoon.

75. On May 18, 2015, a joint federal and multi-state complaint was filed against CSS, CFA, CCFA, and TBCS, as well as their principals, Kyle Effler, James Reynolds Sr., and James Reynolds II, alleging that CSS, CFA, CCFA, and TBCS were each sham charities, and seeking both injunctive relief and restitution to recover $187 million on behalf of defrauded donors. *See Federal Trade Commission; all Fifty States, and the District of Columbia v. Cancer Fund of America, Inc., a Delaware Corporation, et al.*, No. 15-cv-00884-PHX-NVW (hereinafter the "FTC Complaint" or "FTC Action").

76. On June 25, 2015, C&C filed a Second and Final Fee Application as Special Charity Law Counsel for Services Rendered from October 1, 2014 to May 8, 2015. *See Second and Final Fee Application, ECF No. 275*.

77. The Second and Final Fee Application dated June 25, 2015, described the "Administrative Matters" as including "inquiries and requests for information from various governmental agencies in numerous states including Washington, Idaho, New York, Tennessee,

Michigan, Connecticut, Mississippi, Texas, Alabama, Arkansas, Missouri, New Jersey, Minnesota, Illinois, Florida, Ohio, South Carolina, California and also Canada." *See ECF No. 275.*

78. The Second and Final Fee Application of C&C, dated June 25, 2015, contains no disclosure of the FTC Action filed on May 18, 2015, or the representation of CSS by C&C, despite the fact that CSS is listed on the Debtor's schedules. *See ECF No. 33, p. 7 of 79, ¶21.*

79. As anticipated, the operations of the Alleged Sham Charities are being wound down. All four of the Alleged Sham Charities are no longer soliciting funds (CCFA and TBCS have been enjoined in the pending federal district court action, and CFA and CSS have voluntarily ceased solicitations, *see* FTC Action Docket Nos. 12, p.2; 13, p.2; 246, p. 3 of 18.), Debtor's income has already declined since the Plan was confirmed, from approximately $2,400,000 to $2,000,000 per month, based on an examination of the five Monthly Income and Expense Statements filed by the Debtor. *Compare ECF No. 298 with ECF No. 333.*

80. Debtor was aware that the FTC's involvement would only be possible if there were allegations that the Alleged Sham Charities were in fact shams, and that the Debtor knew or should have known that future revenue of the Debtor could not be based on these entities. Subsequent to the filing of the FTC Complaint, Debtor's reported receipts have continued to fall.

81. As a result of Debtor's awareness of the allegations against the Alleged Sham Charities, Debtor knew or should have known that the donors to these charities should also have been listed as creditors.

82. The pending joint Federal and multi-state investigation was a material fact that should have been disclosed to the Court at the confirmation hearing because the entities under investigation included four of the Debtor's principal clients as well as the Debtor.

83.     The Draft FTC Complaint and ongoing joint federal and multi-state investigation were material facts that should have been disclosed to the Court at the confirmation hearing because the entities under investigation included four of the Debtor's principal clients as well as the Debtor.

84.     Debtor's failure to disclose the pending Federal and multi-state investigation was both willful and fraudulent, as it was an attempt to secure a discharge and shed all possible claims of liability against the Debtor for their collections on behalf of the Alleged Sham Charities.  *See N.D. Ill. Case No. 15-cv-08504, Spiegel v. James T. Reynolds; Jim Reynolds; Kristina Hixon; Outreach Calling; and Associated Community Services*.

85.     In addition to claims from defrauded donors, the Debtor may similarly be exposed to liability from its insurance carriers in connection with the Alleged Sham Charities and joint federal and multi-state investigation, as detailed in the following rescission and declaratory judgment actions in the United States District Courts: (1) *Mount Vernon Fire Insurance Company v. Cancer Fund of America, Inc.; James Reynolds, Sr.; and Kyle Effler*, Case No. 14-cv-568 (E.D. Tenn. filed December 9, 2014)*; (2) Great American Insurance Company v. Cancer Support Services*, Case No. 14-cv-14309 (E.D. Mich. filed December 3, 2014).  The allegations that Debtor's principal clients, the Alleged Sham Charities, were in fact shams that were going to be shut down was known to the Debtor long before the confirmation hearing, and yet, Debtor failed to disclose these allegations to the Court.

86.     In the insurance coverage suit against CSS alleged in paragraph 85 above, the allegations against CSS that it was intertwined and may be a related entity of the Debtor and which Cole may have controlled was first broached by the Oregon Department of Justice in 2005.  *See, e.g. E.D. Mich. Case No. 14-cv-14309, ECF No. 28-2, p. 2 of 22, ¶3-4, and p. 10 of 22*.

87.     The Debtor was required to make at a minimum, certain critical disclosures at the confirmation hearing to this Court in light of the allegations made in the joint federal and multi-state investigation, and because of the possibility that, similar to those lawsuits alleged in the paragraphs 75, 84 and 85, above, Debtor may be subject to liability to other parties related to Debtor's conduct and relationship with the Alleged Sham Charities, that may now otherwise be cut off as a result of the discharge entered by this Court.

88.     Specifically, at a minimum, Debtor should have disclosed to this Court, the following allegations which would have allowed this Court to question the Debtor regarding the joint federal and multi-state investigation and its impact on Debtor's reorganization: (1) the allegations that the Debtor was involved with fraudulent charitable solicitation of donations that were not being used for their intended purpose, and whether Debtor was aware of this; (2) whether the Alleged Sham Charities were in fact shams, and therefore would be shut down by the FTC; (3) whether the Debtor and the Alleged Sham Charities were in fact separate corporations or alter-egos of each other; and (4) whether any of the donations made through the Debtor to the Alleged Sham Charities could be found and recovered.  Each of these issues was material to the Court in making its findings in relation to the confirmation process, and Debtor willfully failed to disclose them.

### REVOCATION OF CONFIRMATION ORDER AND DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 1144

89.     Debtor had an affirmative duty to disclose material facts in its disclosure statement and to the Court at the confirmation hearing.

90.     Debtor knew of the pending joint federal and multi-state investigation at the time of the confirmation hearing and made no disclosures about it.

91.     Debtor knew that the ongoing joint federal and multi-state investigation was a material fact, and had been authorized by one or more of the Alleged Sham Charities to discuss both the investigation and the Draft FTC Complaint with C&C, and therefore knew prior to the confirmation hearing that the FTC planned on enjoining the Alleged Sham Charities and that this would deprive the Debtor of almost half of its pre-petition income.

92.     Debtor failed to disclose the pending joint federal and multi-state investigation.

93.     Debtor's failure to disclose the pending joint federal and multi-state investigation was willful.

94.     Debtor's failure to disclose the pending joint federal and multi-state investigation was a fraud upon this Court.

95.     Had the Debtor made full, candid and complete disclosure to the court regarding the existence of the FTC and multi-state investigations, Debtor would not have satisfied the requirement of 11 U.S.C. §§ 1129(a)(1), (a)(2), (a)(3) and (a)(5), because the alleged Sham Charities represented, at a minimum, forty percent of Debtor's prepetition business and a necessary predicate to the Debtor's represented projected future revenue.

96.     Upon information and belief, Debtor had knowledge of the Draft FTC Complaint in the ongoing joint federal and multi-state investigation, prior to the date of filing of the Disclosure Statement in Debtor's Chapter 11 proceedings.  Upon information and belief, Debtor also knew from the Draft FTC Complaint that the FTC and fifty states planned to seek to permanently enjoin the Alleged Sham Charities and seek monetary damages, thus offering the Debtor no hope of a continued revenue stream from the Alleged Sham Charities.  Debtor, who signed C&C's fee applications, did not disclose the existence of the pending joint federal and multi-state investigation, the Draft FTC Complaint, the planned injunctions.

97.     The joint federal and multi-state investigation continued to progress against Debtor's major clients from December 2010, through May 2015, and yet was not been disclosed to this Court or the creditors prior to the confirmation hearing; nor was it disclosed at the confirmation hearing; nor was disclosed when the Court directly questioned Debtor about its projected income.

98.     Upon information and belief, Debtor's failure to disclose the existence of the material information regarding the existence of pending joint federal and multi-state investigation, was willful.

99.     Debtor's own compliance officer, Jody Wahl, was so concerned about the FTC's involvement that she sought and received permission from the "Executive Director" of TBCS to communicate directly with Karen Donnelly of C&C, concerning the continuing status of that investigation.

100.     Debtor's own compliance officer, Jody Wahl, recognized that the FTC would only have jurisdiction to participate in the investigation to the extent that it was being alleged that the Debtor's major clients were sham charities: she requested confirmation of this from Karen Donnelly of C&C, and Ms. Donnelly confirmed that fact.

   *11  U.S.C. §§ 524(e) and 1129(a)(1)*

101.     Debtor's Combined Plan of Reorganization and Disclosure Statement included provisions that purported to release various claims of creditors.  However, with the potential that there are many thousands of potential creditors who donated to the Alleged Sham Charities, as a result of solicitations made by the Debtor, and the donations unaccounted for, the fate of these potential creditors' claims are unknown and their existence is not disclosed.

102.    Furthermore, the amount of the aggregate claims in this potential class of creditors is unknowable at this juncture, but the existence of this class was known and was not defined in the Disclosure Statement.

103.    Because all releases, pursuant to 11 U.S.C. §§ 524(e) and 1129(a)(1), are alleged by the Debtor to be the product of consent validly given by each of the respective parties to such releases, based on the full disclosure required, such consent appears to have been lacking.

104.    Plaintiff contends that the Debtor and its principals were under an affirmative legal duty and were otherwise obliged to disclose the connections and business dealings with the Alleged Sham Charities and the full nature of the ties between entities, and was also obliged to disclose the existence of the joint federal and multi-state investigation and the impact of the Alleged Sham Charities dissolution on Debtor's future business.

105.    Such information was material to the Court's consideration of whether the consent of the creditors to the plan was valid in the first place.  Neither Debtor, nor its principals, nor its counsel disclosed this information to the Court in a timely manner.

106.    Plaintiff contends that the creditors would have voted differently had this material information been disclosed, and that the Court likely never would have approved of the Combined Plan of Reorganization had the Debtor made full, candid and complete disclosures regarding the existence of the ongoing joint federal and multi-state investigation, and the receipt of the Draft FTC Complaint by the Alleged Sham Charities, which Debtor knew about through its compliance officer, Jody Wahl.  Furthermore, attorneys for the Alleged Sham Charities had authorized C&C to discuss the FTC's involvement with the Debtor, and the Debtor knew that the Alleged Sham Charities and their principals were negotiating with the attorneys preparing to file the FTC Action in May, 2015, and that some or all of the Alleged Sham Charities were going to

be enjoined and shut down because of the close relationship between the principals of the Debtor and the Alleged Sham Charities.

107.    Debtor and its principals, had personal knowledge of the existence of material information, and were under the affirmative duty to disclose that information, and affirmatively chose not to disclose the material information relating to the pending joint federal and multi-state investigation.  Upon information and belief, the Debtor and the Alleged Sham Charities coordinated their efforts to ensure that negotiations with the FTC would lead to the filing of the FTC Action after the Debtor received its discharge from this Court.  This omission or misrepresentation was calculated to influence the Court's consideration and determination of the plan's merits under 11 U.S.C. §§ 524(e) and 1129(a)(1).

108.    Debtor and its principals, by their omissions and misrepresentations, failed to disclose facts that were material to the scope of the property of the estate and pool of creditors, and induced the Court to enter the Confirmation Order.  At the very minimum, the long-standing nature of the relationship between Debtor's principals and the principals and named individual defendants in the FTC Action, means these omissions were made with a reckless disregard for the truth.

109.    The information was material, since Debtor has expressly assumed executory contracts with some of the Alleged Sham Charities or charities under investigation in other states, and this information cuts against the viability of the Debtor's business model and ultimate ability to perform under the plan, and therefor was material information.

110.    Various creditors of the Debtor filed objections to the Debtor's Plan, either formal or informal, and all of these were resolved via stipulation prior to the confirmation hearing, yet the Court was still determined to hold a confirmation hearing to be able to question the Debtor on

the record.  *See* ECF No. 255, p.1-2.  Because of Debtor's lack of candor up to and during the confirmation hearing, the Court was deprived of the ability to inquire of the fate of the potential class of creditors that may wish to file a claim against the Debtor for its connections to the Alleged Sham Charities, and whether the loss of a significant portion of Debtor's net income would affect the plan.  The Plaintiff respectfully submits, that this Court was prejudiced by not being able to ask such questions, and this represents a fraud upon the Court within the meaning of 11 U.S.C. § 1144.

*11  U.S.C. § 1129(a)(2) and Debtor's Materially Defective Disclosure Statement*

111.    By failing to make full, candid and complete disclosure of Debtor's knowledge of and connections to the  joint federal and multi-state investigation lasting five years, receipt of the Draft FTC Complaint, and by not disclosing the full nature of Debtor's dealings and relationship with the Alleged Sham Charities, Debtor's Disclosure Statement was materially defective.

112.    Richard Cole signed the Disclosure Statement.  ECF No. 133.

113.    As an officer of the Court, Richard Cole was under an affirmative duty to disclose his connections to and dealings with the Alleged Sham Charities, the relationship with CSS, as well as his knowledge of the joint federal and multi-state investigation and the FTC's determination to enjoin the Alleged Sham Charities.  Such information from Cole and the Debtor were material to this Court, creditors, potential creditors, and other parties in interest.

114.    At a minimum, holders of claims needed to be made aware of these connections as part of Debtor's duty to provide adequate information under 11 U.S.C. § 1125(a) in order for such claim holders to make an informed judgment regarding whether to vote for or against the plan.

115.    Debtor and its principals made these material misrepresentations by omission with actual fraudulent intent because Debtor and Richard Cole had knowledge of their connections to, and

dealing with the Alleged Sham Charities. Debtor and Richard Cole were under an affirmative legal duty to disclose such connections, their knowledge of the joint federal and multi-state investigation and impending FTC Action, and both failed to do so.

116.    Plaintiff respectfully submits that Debtor would not have been able to carry its burden establishing that Debtor, as plan proponent, satisfied the requirements of 11 U.S.C. § 1129(a)(2), had the Court had the benefit of this information on April 24, 2015, at the time of the confirmation hearing.

*11 U.S.C. § 1122*

117.    Section 1122 requires the classification of claims of creditors. Disclosures need to be made to creditors in the disclosure statement, pursuant to 11 U.S.C. § 1125. The creditors have voting rights and the plan cannot be confirmed without enough votes. *See* 11 U.S.C. § 1129(a)(7) and (8). Notice of the proposed confirmation and voting rights must be provided to creditors under Fed. R. Bankr. P. 2002(b). Here, none of the donors or creditors of the Alleged Sham Charities were given notice of this bankruptcy case or the confirmation hearing and the plan proposed to cut off their rights with a discharge under section 11 U.S.C. § 1141(d) although nothing was provided for their claims, and those plaintiffs now naming both the Alleged Sham Charities and the Debtor in putative class actions before other courts may have their rights severely paralyzed due to their lack of notice of this bankruptcy case.

*11 U.S.C. §§ 1129(a)(3), 1129(a)(5),and 1129(a)(10)*

118.    Debtor and its principals failure to disclose their knowledge of the joint federal and multi-state investigation, the receipt of the Draft FTC Complaint by their principal clients, their dominion and control of CSS, and their connections to or relationships with the Alleged Sham Charities, also constitutes a material misrepresentation by omission in connection with Debtor's

burden of establishing that Debtor's plan was proposed in good faith and not by any means forbidden by law, as required by 11 U.S.C. § 1129 (a)(3), and the continued service of principals in their capacity as principals of a Debtor-in-Possession satisfied the requirements of 11 U.S.C. § 1129(a)(5)(A)(ii).

119.    Given that Debtor and its principals knew of the ongoing joint federal and multi-state investigation, through the authorized disclosures from C&C and/or through its control of CSS, and because Debtor was aware it was also being targeted by the investigation, shows that these entities have more than a mere arm's length contracting relationship. Debtor, by allowing its responses to the multi-state investigation to be disclosed to the Alleged Sham Charities in 2010, has waived any and all claims that the information was privileged.

120.    Plaintiff contends that had Debtor made full, candid and complete disclosures of the pending joint federal and multi-state investigation, the Court would not have confirmed the proposed plan of reorganization under 11 U.S.C. § 1129(a)(3).

121.    Debtor also has the burden, during the confirmation process, to demonstrate to the Court that the Plan is feasible under 11 U.S.C. § 1129(a)(10). The projections of income contained in the disclosure statement, by way of the executory contracts with the Alleged Sham Charities, necessarily included income from the solicitations of donations pursuant to these contracts. As 90% or more of the donations were being used for expenses of the Debtor and the Alleged Sham Charities and never reached any charities, as alleged by the FTC, there is some question about whether any money was used for a charitable purpose and accordingly, this places the continued operation of the Debtor into serious doubt, and Debtor has not amended its disclosures in any way to inform this Court how its Plan can still be feasible despite this lost revenue.

122.     Additionally, Debtor's lost good will, as a self-styled "premier" fundraising corporation, by virtue of being involved with a national fraud on an unprecedented scale that necessitated, for the first time in history, all fifty states joining together with the FTC to investigate and enjoin the Alleged Sham Charities may have a debilitating effect on the Debtor as a going concern.

123.     The joint federal and multi-state investigation was focused on the fraudulent procurement of the donations.  At the confirmation hearing, the Court and creditors should have been told that the some or all of the income operations of the Debtor and the Alleged Sham Charities were at risk of being shut down due to fraud, and that the source of funding of the plan might be shut off.  Debtor was aware or should have been aware well before the confirmation hearing, that by virtue of the investigation itself, and/or the receipt of the Draft FTC Complaint and the insurance coverage actions against the Alleged Sham Charities based on fraud, that it's future revenue based on these specific clients which were submitted to the Court, was in serious jeopardy.

124.     The possibility that the Alleged Sham Charities may not be separate corporations as demonstrated by the evidence of alter-ego status by CSS, is relevant because the Debtor might have not disclosed all of its assets if the assets of the Alleged Sham Charities belong to the Debtor, or if there is unaccounted for or missing donations that the Receiver winding up the affairs of the Alleged Sham Charities seeks to recover from the Debtor.

125.     The Disclosure Statement contains income projections and a liquidation analysis. Creditors might be entitled to different payouts if there are more assets to be found.  This would also change the value of the secured claims of the Internal Revenue Services, and other creditors, under 11 U.S.C. § 506(a).  The Debtor has lodging an objection to the IRS's proof of claim in this Bankruptcy Case, and discovery in this contested matter is ongoing as to both the underlying

tax liability of the Debtor, and Debtor's proffered valuation for classification of the IRS's proof of claim.

126.    The nature of the secured and unsecured claims for not only the IRS, but as to the claims of all other creditors change if the pool of assets changes.  The indicia of the extent to which the Debtor and Alleged Sham Charities assets and affairs were intertwined are staggering and should have also been disclosed during the confirmation process.

127.    If the Alleged Sham Charities are indeed shams (which TBCS and CCFA has already by implication agreed to), and not separate taxpayers, there are also likely additional tax claims that could be made by the IRS based upon the operations of the Alleged Sham Charities.  If the entities are shams, they might not be entitled to their previous exempt tax status and all of the donations may be subject to income tax—even if procured by fraud.

128.    The fact that the Alleged Sham Charities appear to be intertwined with the Debtor may indicate that, if there are any unpaid other taxes against the Alleged Sham Charities, the IRS might be able to claim these delinquencies against the debtor.  The Debtor's complete lack of candor precluded this Court and the creditors from investigating the true nature, extent and valuation of the estate and liabilities at issue in the bankruptcy proceeding.  The Debtor and the IRS are contesting the valuation of the secured claims, but with the misrepresentations now exposed, other similarly situated creditors to the IRS (including, but not limited to, the State of Michigan Department of Treasury, and Nougar, P.C.) with pending objections by the Debtor to their respective proofs of claim, may also require to have the confirmation order revoked in the interests of justice to open the door.  The Debtor's willful misrepresentations induced this Court to enter the confirmation order, which was an injustice done to creditors both disclosed and not disclosed.  *See ECF. Nos. 358 and 361.*

129.    Debtor acted with fraudulent intent because it knew of and failed to disclose the ongoing joint federal and multi-state investigation and Debtor's connections with the Alleged Sham Charities, and knew that Debtor's management, dominion and control of CSS would operate to make CSS' assets and liabilities those of the Debtor, and there was an affirmative duty to disclose such connections and knowledge.

130.    The Court entered the Confirmation Order and found that Debtor's plan satisfied the requirements of 11 U.S.C. § 1129(a) due to the material affirmative misrepresentations and material misrepresentations by omission on the part of Debtor and its principals.

131.    But for these omissions and misrepresentations, Debtor's plan would not have been confirmed.

132.    Therefore, Plaintiff United States respectfully requests entry of an order and judgment revoking the confirmation order, pursuant to 11 U.S.C. § 1144 and revoking Debtor's discharge pursuant to 11 U.S.C. § 1144(2).

WHEREFORE, the plaintiff United States of America respectfully request that the Court enter an order and judgment (1) revoking the Confirmation Order, *ECF No. 258* pursuant to 11 U.S.C. § 1144, (2) revoking Debtor's Discharge pursuant to 11 U.S.C. § 1144(2), and (3) for such other relief as the that the Court deems to be justified under the circumstances.

Dated: December 14, 2015

Respectfully submitted,

UNITED STATES OF AMERICA
(Internal Revenue Service)
Creditor

*/s/ John A. Lindquist*
JOHN A. LINDQUIST
SENIOR LITIGATION COUNSEL
OFFICE OF CIVIL LITIGATION
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 403, Ben Franklin Station
Washington, D.C.  20044
Telephone:    (202) 307-6561
Facsimile:    (202) 307-2504
E-mail: John.A.Lindquist@USDOJ.GOV
JEFFREY N. NUNEZ
Trial Attorney, Tax Division
United States Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Telephone:    (202) 616-5218
Facsimile:    (202) 514-5238
Email: Jeffrey.N.Nunez@usdoj.gov

## CERTIFICATE OF SERVICE

I, Jeffrey N. Nunez, hereby certify that on December 14, 2015, I electronically filed the foregoing Adversary Complaint via this Court's ECF system, to counsel for the debtor, the U.S. Trustee, and all other parties requesting notice through this Court's ECF system. The United States submits that, under the circumstances, no other or further notice is required.

/s/ Jeffrey N. Nunez
JEFFREY N. NUNEZ
Trial Attorney, Tax Division
U.S. Department of Justice